UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN P. CALLAGHAN, IV,
DAVID F. DALLAS,
9555 VILLAGE PLACE BLVD., LLC,
A Michigan limited liability company,
O'CALLAGHAN'S II, INC., a
Michigan corporation, and
PENNIMAN INVESTMENT GROUP, LLC,
A Michigan limited liability company,

      Plaintiffs

Vs

UNITED STATES OF AMERICA,
DEPARTMENT OF TREASURY,
SMALL BUSINESS ADMINISTRATION, and
TALMER BANK & TRUST f/k/a FIRST PLACE BANK
f/k/a FRANKLIN BANK, N.A. a Michigan state
chartered bank

      Defendants

_____/

Civil Action No.:5:15-cv-10513-JEL-RSW
Hon. Judith E. Levy
Magistrate Judge Hon. R. Steven Whalen

**JOINT DISCOVERY PLAN**

Plaintiffs and Defendants, by their counsel, make the following Rule 26(f) Conference Report:

1. Conference:

The parties have met and conferred to discuss various discovery issues and the creation of this Joint Discovery Plan. Prior to the Court's May 13, 2015 Case Management Status Order, Counsel for Plaintiffs and Counsel for the United States of America Defendants had several e-mail exchanges and telephone conversations, including a conference call on June 4, 2015, to discuss discovery.

**2. Case Summary/Background of Action:**

    **a. Plaintiffs:**

{00226465}1

Plaintiffs allege in this action that the Court should, pursuant to 28 U.S.C. §2201, issue a Declaratory Judgment that the Plaintiffs owe no liability to the United States Defendants (the Wage Garnishment Orders have voluntarily been withdrawn) related to the SBA-guaranteed loan, or, alternatively, that the United States Defendants must afford the Plaintiffs due process and adhere to the requirements of 31 U.S.C §3720D before taking any further action if no such Declaratory Judgment is issued.

Additionally, and only in the event that this Court denies the request for the Declaratory Judgment against the United States Defendants, Plaintiffs seek a judgment against Talmer Bank for whatever amount the United States Defendants are claiming is owed from the Plaintiffs, on the theory of Breach of Contract.

9555 Village Place Blvd, LLC and O'Callaghan's II, LLC obtained (1) a Construction Loan (the "O'Callaghan's Loan") in the amount of $2.0 Million from Franklin Bank; and (2) a Term Mortgage Loan in the amount of $2.0 Million from Franklin Bank.  O'Callaghan's operated a bar/restaurant in Green Oak Township, Michigan.  Plaintiffs Callaghan and Dallas, as well as non-party Penniman Investment Group, LLC, guaranteed this Loan.

This Term Mortgage Loan portion was guaranteed, but not initiated, by the SBA, at 56.525% of $2.0 Million.  The SBA also required that Penniman Investment Group, LLC give a Second Mortgage on the Penniman property as collateral for the O'Callaghan's Term Mortgage Loan.  Both the Bank and the SBA had required that the Penniman property had to be pledged as collateral to obtain the O'Callaghan's Loan.

The involvement of Penniman Investment Group, LLC as a guarantor of the O'Callaghan's Loan, both with the Bank and with the SBA, was an early indication of the Bank's (and the SBAs) treatment of the two loans as being related to each other.  This set the foundation for the treatment

of the O'Callaghan's Loan Documents as being "other Loan Documents", "Related Documents", etc, and is clearly the "Second Mortgage" directly referred to in the Release.

Because the O'Callaghan's Loan was in default, the Bank demanded that all of the assets of O'Callaghan's be surrendered, and Plaintiffs' complied, in order to save Penniman. On September 30, 2010, therefore, O'Callaghan's II, LLC, Callaghan, and Dallas delivered a Collateral Surrender Agreement, turning over all assets of O'Callaghan's to the Bank, and walking away. This was part of the overall discussions with the Bank as to how to fully extinguish both loans.

On November 30, 2010, First Place Bank issued an Amended and Restated Commercial Loan Note, and Loan Modification Agreement related to the Penniman property (together, the "Amended Penniman Loan") to re-write the Penniman note.

Plaintiffs eventually obtained refinancing from a new lender and negotiated a final settlement with First Place Bank f/k/a Franklin Bank. Consideration included payment of a new $850,000, which was paid directly to First Place from the title company handling the closing. Together with the surrendered collateral, the overall value paid to the Bank was estimated at over $2.0 Million.

Plaintiffs walked away from the settlement justifiably believing, from the documents, the discussions with the Bank, and the overall value given, that both the O'Callaghan's Loan and the Penniman Loan had been fully extinguished in the combination of the Collateral Surrender and the Settlement Agreement and Release.

Plaintiffs had no further communication regarding these Loans for almost two years, until they received a Notice of Intent to Initiate Administrative Wage Garnishment Proceedings from the United States in September, 2014, in the amount of $2,350.100.10. There is no reason that Talmer Bank should have made a claim under the SBA guaranty. Talmer was wholly compensated (at least to their satisfaction in the negotiated compromise settlement) by the collateral and the $850,000.00, and, as shown by the Release, gave up their claims against the Plaintiffs. At the time of the

Collateral Surrender Agreement on the O'Callaghan's Loan, when the parties knew and intended that the Penniman Loan was still in effect, Talmer Bank included the language in the closing documents, evidencing their intent that the global lending relationship was not over. [Doc #23-8; Pg ID 220, ¶6].

When the Plaintiffs found the new lender and paid off the remaining Penniman Loan for an additional $850,000, Talmer Bank created a Settlement Agreement and Release which did not contain the language from the Collateral Surrender Agreement, evidencing that Talmer Bank knew that the entire lending relationship was fully satisfied. Because the Penniman property was always a second mortgage on the O'Callaghan's Loan and SBA guaranty, and was clearly identified as a "Loan Document", the Release makes it clear that the Bank "irrevocably and unconditionally" released the O'Callaghan's debt as well as the Penniman debt at the time of the Settlement Agreement and Release.

When a Borrower fully satisfies its obligation to the Lender Bank, it has no further liability to the SBA, because that Lender Bank has no business thereafter making any claims on the SBA guaranty.

Neither Talmer nor the SBA ever notified the Plaintiffs that Talmer made a claim to the SBA for the guaranty monies. Plaintiffs believe that one of Talmer's predecessors, First Place Bank, saw an opportunity to "double dip" by accepting Plaintiffs' repayment as a negotiated full satisfaction, then tapping the SBA for the guaranteed funds, perhaps without even telling Talmer Bank, which was about to purchase First Place Bank.

If Plaintiffs do not owe Talmer, Plaintiffs do now owe the SBA. The SBA likely has a cause of action against Talmer under such circumstances.

**b. United States Defendants**:

The SBA agreed to guarantee a Term Mortgage Loan up to 56.525% of $2.0 Million. The Term Mortgage Loan was also guaranteed by Plaintiffs Callaghan and Dallas, and to a limited extent by non-party Penniman Investment Group, LLC. On or about January 28, 2011, the Lender made a demand for payment from the SBA under the guarantee. Payment was made to the Lender. The SBA then began proceedings to recover its payment from Plaintiffs Callaghan and Dallas pursuant to their guarantees. At no time was the SBA consulted as to, nor did it agree to, the release of Plaintiffs Callaghan and/or Dallas from the guarantees executed as part of the Term Mortgage Loan. Additionally, Lender was not authorized to act as an agent on behalf of the SBA. The SBA denies that the documents relied on by Plaintiffs establish the release of their obligations under the Term Mortgage Loan.

After SBA made payment to Lender, the SBA, through the Department of Treasury, initiated garnishment proceedings against Plaintiffs Callaghan and Dallas. Plaintiffs Callaghan and Dallas were provided notice of the intent to initiate administrative garnishment proceedings. They were also instructed that they could request a hearing prior to the issuance of an administrative wage garnishment order by completing the enclosed Request for Hearing Form by the specified date. Plaintiffs failed to properly complete the Request for Hearing Form by the date specified and administrative wage garnishment orders were issued without a hearing. The Department of Treasury denies that Plaintiffs were denied due process. Pending the outcome of this action, the Department of Treasury agreed to stay collection against Plaintiffs Callaghan and Dallas.

**c. Defendant Talmer Bank**:

Talmer requests that the Court dismiss this case on its motion to dismiss because the case lacks any factual support or legal basis.

There are two relevant loans. The first is the Penniman Loan. On September 25, 2006, Penniman Investment Group, LLC obtained a Commercial Term Loan from Talmer's predecessor

in interest—the so-called Penniman Loan—for $1,500,000. Penniman executed a promissory note that set out the repayment terms. As security for repayment of the loan, Penniman granted Talmer's predecessor in interest a *first* mortgage ("First Mortgage") on property commonly known as 821 Penniman Avenue, Plymouth, Michigan 48170 (the "Penniman Property"). Plaintiffs Village Place LLC, O'Callaghans II, LLC, and David Dallas were not parties to the Penniman loan.

The other loan is called the Village Place loan. It was made on January 16, 2007 and the borrowers were Plaintiffs Village Place LLC and O'Callaghan's II. They obtained a one-year construction loan in the amount of $2,000,000 from Talmer's predecessor in interest. The construction loan was evidenced by a construction loan agreement which was superseded and amended by an 18-year term mortgage loan agreement also in the amount of $2,000,000. The conversion of the construction loan into the term loan was a totally routine transaction. The reason banks and borrowers convert construction loans into term loan is because when the "construction" is complete, the "construction" provisions of the agreement are no longer applicable, but conventional "term loan" provisions are needed. Hence, as is done in virtually all similar transactions, the construction loan was converted into a term loan.

The real property on which the construction took place is commonly known as 9555 Village Place Boulevard, Greek Oak Township, MI 48114) (the "Village Place Property"). In addition to a promissory note setting out payment terms, the Village Place loan was secured a mortgage Village Place executed encumbering the Village Place Property.

Talmer's predecessor in interest also, as security for repayment of the Village Place loan, took a second mortgage on the Penniman Property. This mortgage is known, not surprisingly, as the "Second Mortgage."

The taking of the "Second Mortgage" on property already encumbered in connection with a different loan is not unique. It is a garden variety procedure done every day in the commercial real

estate banking industry. Millions if not billions of loans across the country and in Michigan are secured first mortgages and then also second on different property.

In October 2012, Penniman was in default of its Penniman Loan obligations. This was not the first time Penniman was default. While not relevant to this case, Talmer had been forced to make several loan concessions to Penniman previously. To remedy the October 2012 default, Talmer's predecessor in interest agreed to accept a major loss on the Penniman Loan and enter into a settlement agreement with Penniman LLC.

The settlement was simple. Talmer's predecessor in interest accepted a deeply discounted total sum of $850,000.00 as full settlement of the Penniman Loan and therefore was required to release its First Mortgage on the Penniman Property for less than the balance owed on the Penniman Loan. After receipt of the money, Talmer's predecessor in interest discharged the First Mortgage on the Penniman Property. Talmer's predecessor in interest also had to discharge the "Second Mortgage" on the Penniman Property, which, as stated, was originally given as additional security for the Village Place loan.

The reason for the discharge of the Second Mortgage is because the refinance lender required a *first* mortgage on the Penniman Property for itself and would **never** have agreed to make the refinance loan if it was not getting a first priority lien against the Penniman Property.

To document the agreement, Talmer's predecessor in interest, along with Penniman LLC, and John Callaghan, entered into a Settlement Agreement and a Release. The Settlement Agreement and Release specifically identified *only* the Penniman Loan instruments along with the "Second Mortgage" as the instruments that were cancelled and released by the Settlement Agreement and Release.

In this case, Plaintiffs misconstrue, stretch, and add a great deal of rhetoric to try to argue that the language of the Settlement Agreement and Release somehow also discharged the obligations owed under the Village Place loan instruments.  Plaintiffs are wrong.

No documents, not one, support Plaintiffs' case.  No documents, not one, support the theory that Plaintiffs could have thought the Village Place loan was impacted by the Settlement Agreement and Release.  The argument that the Bank "irrevocably and unconditionally" released the O'Callaghan's debt as well as the Penniman debt at the time of the Settlement Agreement and Release is not simply untrue; it is belied by dozens of loan instruments, defined terms, and even correspondence sent *by Plaintiffs* after the Settlement Agreement and Release was executed and completed.

Plaintiffs also misstate hornbook law by arguing that when a borrower fully satisfies its obligation to a lender bank, it has no further liability to the SBA, according to Plaintiff because that lender bank has no business thereafter making any claims on the SBA guaranty.

Here, the SBA guaranteed but a portion of the loan.  Thus, Talmer still has the ability to collect from Plaintiffs the amount of the loans that were not repaid to Talmer.

Talmer also had no obligation to notify Plaintiffs that it made a claim to the SBA on its guaranty.

Plaintiff's "double-dipping" comment is meritless.  Plaintiffs have cost Talmer hundreds of thousands of dollars in losses by breaching its loan agreements.

Not only do Plaintiffs owe the SBA, they still owe Talmer the balance that the SBA for which Talmer was not compensated on its guaranty.

In this case proceeds to trial, Talmer will call dozens of SBA and banking witnesses and proffer dozens of loan instruments showing Plaintiffs' entire case lacks merit.

**3. Disclosures under Rule 26(a)**:

The parties agree that initial Rule 26(a) disclosures shall be within 21 days of the entry of this Joint Discovery Plan.

**4. Proposed Discovery Plan:**

    **a. Plaintiffs**:

While not an all-inclusive list, Plaintiffs suggest that discovery may be needed on the following subjects:

- Communication and documents related to O'Callaghan's Loan;
- Communications and documents related to Penniman Loan;
- Communications and documents between SBA and borrower;
- Communications and documents between SBA and lender bank related to SBA decision to guaranty loan;
- Communications and documents between SBA and lender bank related to lender bank claim against guaranty;
- Documents, reviews, internal communications among the United States Defendants related to their determination of Plaintiffs' alleged liability;
- Documents related to calculation of alleged damages and interest.

Plaintiffs do not believe that any unusual limitations on discovery are needed at this point, or that discovery should be divided into phases.

Plaintiffs do not believe that more than ten (10) depositions will be needed by any party. [Fed. R. Civ. P. 30(a)(2)]

Plaintiffs propose the following schedule:

    1. Discovery Schedule

   a. All non-expert discovery shall be completed by November 15, 2015

   b. Plaintiffs' expert report(s) shall be disclosed in accordance with the requirements of Rule 26 by December 15, 2015

   c. Defendants' expert report(s) shall be disclose in accordance with the requirements of Rule 26 by January 30, 2016

   d. Plaintiffs' expert reply report shall by disclose in accordance with the requirements of Rule 26 by February 28, 2016

   e. Expert depositions shall be completed by March 30, 2016

2. Motion Schedule

   a. Summary Judgment motions shall be filed by April 15, 2016

3. Trial Ready Date

   a. The case will be ready for trial 90 days after the Court rules on all post-discovery Summary Judgment motions

   b. The Final Pre Trial Conference will be held approximately 30 days before trial.

**b. United States Defendants**:

The SBA and the Department of Treasury agree with the proposed discovery schedule.

**c. Defendant Talmer Bank**:

Talmer does not believe that any discovery is needed and that the case should be resolved on the pending dispositive motion. If the case is not, the discovery subjects and timeline suggested by Plaintiffs, subject to a review of the language used in any particular discovery request, is agreeable.

**5. Proposed Order Relating to Discovery of Electronically Stored Information (ESI)**:

The parties agree to the entry of the Eastern District Model Order Relating to the Discovery of Electronically Stored Information (ESI) as issued September 20, 2013, as follows:

{00226465}10

*General Principles*

**Principle 1.01 (Purpose)**

The purpose of these Principles is to assist courts in the administration of Federal Rule of Civil Procedure 1, to secure the just, speedy, and inexpensive determination of every civil case, and to promote, whenever possible, the early resolution of disputes regarding the discovery of electronically stored information ("ESI") without Court intervention. Understanding of the feasibility, reasonableness, costs, and benefits of various aspects of electronic discovery will inevitably evolve as judges, attorneys, and parties to litigation gain more experience with ESI and as technology advances.

**Principle 1.02 (Cooperation)**

An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions.

**Principle 1.03 (Discovery Proportionality)**

The proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C) should be applied in each case when formulating a discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as practicable. Where the discovery request is potentially burdensome to the responding party, the parties should consider options such as staging discovery and sampling, in an attempt to reduce the costs of production. If the discovery request seeks marginally relevant information, the requesting party should expect some cost shifting to be imposed by the Court in the absence of an agreement between the parties.

*Early Case Assessment Principles*

**Principle 2.01 (Duty to Meet and Confer on Discovery and to Identify Disputes for Early Resolution)**

(a) Prior to the initial status conference with the Court, counsel shall meet and discuss the application of the discovery process set forth in the Federal Rules of Civil Procedure and these Principles to their specific case. Among the issues to be discussed are:

(1) the identification of relevant and discoverable ESI and documents, including methods for identifying an initial subset of sources of ESI and documents that are most likely to contain the relevant and discoverable information as well as methodologies for culling the relevant and discoverable ESI and documents from that initial subset (see Principle 2.05);

(2) the scope of discoverable ESI and documents to be preserved by the parties;

(3) the formats for preservation and production of ESI and documents;

(4) the potential for conducting discovery in phases or stages as a method for reducing costs and burden; and

(5) the potential need for a protective order and any procedures to which the parties might agree for handling inadvertent production of privileged information and other privilege waiver issues pursuant to Rule 502(d) or (e) of the Federal Rules of Evidence.

(b) Disputes regarding ESI that counsel for the parties are unable to resolve shall be presented to the Court at the initial status conference, Fed. R. Civ. P. 16(b) Scheduling Conference, or as soon as possible thereafter.

(c) The attorneys for each party shall review and understand how their respective client's data is stored and retrieved before the meet and confer discussions in order to determine what issues must be addressed during the meet and confer discussions.

(d) If the Court determines that any counsel or party in a case has failed to cooperate and participate in good faith in the meet and confer process or is impeding the purpose of these Principles, the Court may require additional discussions prior to the commencement of discovery, and may impose sanctions, if appropriate.

**Principle 2.02 (E-Discovery Liaison(s))**

In most cases, the meet and confer process will be aided by participation of an e-discovery liaison(s) as defined in this Principle. In the event of a dispute concerning the preservation or production of ESI, each party shall designate an individual(s) to act as e-discovery liaison(s) for purposes of meeting, conferring, and attending court hearings on the subject. Regardless of whether the e-discovery liaison(s) is an attorney (in-house or outside counsel), a third party consultant, or an employee of the party, the e-discovery liaison(s) must:

(a) be prepared to participate in e-discovery dispute resolution;

(b) be knowledgeable about the party's e-discovery efforts;

(c) be, or have reasonable access to those who are, familiar with the party's electronic information storage systems and capabilities in order to explain those systems and capabilities and answer relevant questions; and

(d) be, or have reasonable access to those who are, knowledgeable about the technical aspects of e-discovery, including electronic document storage, organization, and format issues, and relevant information retrieval technology, including search methodology.

**Principle 2.03 (Preservation Requests and Orders)**

(a) Appropriate preservation requests and preservation orders further the goals of these Principles. Vague and overly broad preservation requests do not further the goals of these Principles and are therefore disfavored. Vague and overly broad preservation orders should not be sought or

entered. The information sought to be preserved through the use of a preservation letter request or order should be reasonable in scope and mindful of the factors set forth in Rule 26(b)(2)(C).

(b) To the extent counsel or a party requests preservation of ESI through the use of a preservation letter, such requests should attempt to ensure the preservation of relevant and discoverable information and to facilitate cooperation between requesting and receiving counsel and parties by transmitting specific and useful information. Examples of such specific and useful information include, but are not limited to:

> (1) names of the parties;
>
> (2) factual background of the potential legal claim(s) and identification of potential cause(s) of action;
>
> (3) names of potential witnesses and other people reasonably anticipated to have relevant evidence;
>
> (4) relevant time period; and
>
> (5) other information that may assist the responding party in assessing what information to preserve.

(c) If the recipient of a preservation request chooses to respond, that response should provide the requesting counsel or party with useful and specific information regarding the preservation efforts undertaken by the responding party. Examples of such useful and specific information include, but are not limited to, information that:

> (1) identifies what information the responding party is willing to preserve and the steps being taken in response to the preservation letter;
>
> (2) identifies any disagreement(s) with the request to preserve; and
>
> (3) identifies any further preservation issues that were not raised.

(d) Nothing in these Principles shall be construed as requiring the sending of a preservation request or requiring the sending of a response to such a request.

**Principle 2.04 (Scope of Preservation)**

(a) Every party to litigation and its counsel are responsible for taking reasonable and proportionate steps to preserve relevant and discoverable ESI within its possession, custody, or control. Determining which steps are reasonable and proportionate in particular litigation is a fact specific inquiry that will vary from case to case. The parties and counsel should address preservation issues at the outset of a case, and should continue to address them as the case progresses and their understanding of the issues and the facts improves.

(b) Discovery concerning the preservation and collection efforts of another party may be appropriate but, if used unadvisedly, can also contribute to the unnecessary expense and delay and may inappropriately implicate work product and attorney-client privileged matter. Accordingly, prior to initiating such discovery a party shall confer with the party from whom the information is sought concerning: (i) the specific need for such discovery, including its relevance to issues likely to arise in the litigation; and (ii) the suitability of alternative means for obtaining the information. Nothing herein exempts deponents on merits issues from answering questions concerning the preservation and collection of their documents, ESI, and tangible things.

(c) The parties and counsel should come to the meet and confer conference prepared to discuss the claims and defenses in the case including specific issues, time frame, potential damages, and targeted discovery that each anticipates requesting. In addition, the parties and counsel should be prepared to discuss reasonably foreseeable preservation issues that relate directly to the information that the other party is seeking. The parties and counsel need not raise every conceivable issue that may arise concerning their preservation efforts; however, the identification of any such preservation issues should be specific.

(d) The following categories of ESI generally are not discoverable in most cases, and if any party intends to request the preservation or production of these categories, then that intention should be discussed at the meet and confer or as soon thereafter as practicable:

(1) "deleted," "slack," "fragmented," or "unallocated" data on hard drives;

(2) random access memory (RAM) or other ephemeral data;

(3) on-line access data such as temporary internet files, history, cache, cookies, etc;

(4) data in metadata fields that are frequently updated automatically, such as last-opened dates;

(5) backup data that is substantially duplicative of data that is more accessible elsewhere; and

(6) other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business.

(e) If there is a dispute concerning the scope of a party's preservation efforts, the parties or their counsel must meet and confer and fully explain their reasons for believing that additional efforts are, or are not, reasonable and proportionate, pursuant to Rule 26(b)(2)(C). If the parties are unable to resolve a preservation issue, then the issue should be raised promptly with the Court.

(f) Absent an order of the Court upon a showing of good cause or stipulation by the parties, a party from whom ESI has been requested shall not be required to search for responsive ESI:

(1) from more than ten (10) key custodians;

(2) that was created more than five (5) years before the filing of the lawsuit;

(3) from sources that are not reasonably accessible without undue burden or cost; or

(4) for more than 160 hours, exclusive of time spent reviewing the ESI determined to be responsive for privilege or work product protection, provided that the producing party can demonstrate that the search was effectively designed and

efficiently conducted. A party from whom ESI has been requested must maintain detailed time records to demonstrate what was done and the time spent doing it, for review by an adversary and the Court, if requested.

**Principle 2.05 (Identification of Electronically Stored Information)**

(a) At the Rule 26(f) conference or as soon thereafter as possible, counsel or the parties shall discuss potential methodologies for identifying ESI for production.

(b) Topics for discussion may include, but are not limited to, any plans to:

(1) eliminate duplicative ESI and whether such elimination will occur only within each particular custodian's data set or whether it will occur across all custodians;

(2) filter data based on file type, date ranges, sender, receiver, custodian, search terms, or other similar parameters; and

(3) use keyword searching, mathematical, or thesaurus-based topic or concept clustering, or other advanced culling technologies.

**Principle 2.06 (Production Format)**

(a) At the Rule 26(f) conference, counsel and the parties should make a good faith effort to agree on the format(s) for production of ESI (whether native or some other reasonably usable form). If counsel or the parties are unable to resolve a production format issue, then the issue should be raised promptly with the Court.

(b) The parties should confer on whether ESI stored in a database or a database management system can be produced by querying the database for discoverable information, resulting in a report or a reasonably usable and exportable electronic file for review by the requesting counsel or party.

(c) ESI and other tangible or hard copy documents that are not text searchable need not be made text-searchable.

(d) Generally, the requesting party is responsible for the incremental cost of creating its copy of requested information. Counsel or the parties are encouraged to discuss cost sharing for optical character recognition (OCR) or other upgrades of paper documents or non-text-searchable electronic images that may be contemplated by each party.

*Education Provisions*

**Principle 3.01 (Judicial Expectations of Counsel)**

Because discovery of ESI is being sought more frequently in civil litigation and the production and review of ESI can involve greater expense than discovery of paper documents, it is in the interest of justice that all judges, counsel, and parties to litigation become familiar with the fundamentals of discovery of ESI. It is expected by the judges adopting these Principles that all counsel will have done the following in connection with each litigation matter in which they file an appearance:

(1) Familiarize themselves with the electronic discovery provisions of Federal Rules of Civil Procedure, including Rules 26, 33, 34, 37, and 45, as well as any applicable State Rules of Procedure;

(2) Familiarize themselves with the Advisory Committee Report on the 2006 Amendments to the Federal Rules of Civil Procedure, available at:

http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/EDiscovery_w_Notes.pdf; and

(3) Familiarize themselves with these Principles.

**Principle 3.02 (Duty of Continuing Education)**

Judges, attorneys, and parties to litigation should continue to educate themselves on electronic discovery by consulting applicable case law, pertinent statutes, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, The Sedona Conference® publications relating to

electronic discovery,[1] additional materials available on web sites of the courts,[2] and of other organizations[3] providing education information regarding the discovery of ESI.[4]

**Principle 3.03 (Non-Waiver of Attorney-Client Privilege or Work Product Protection)**

As part of their duty to cooperate during discovery, the parties are expected to discuss whether the costs and burdens of discovery, especially ESI, may be reduced by entering into a non-waiver agreement pursuant to Fed. R. Evid. 502(e). The parties also should discuss whether to use computer-assisted search methodology to facilitate pre-production review of ESI to identify information that is beyond the scope of discovery because it is attorney-client privileged or work product-protected.

**Principle 3.04 (Discovery From Nonparties)**

Parties issuing requests for ESI from nonparties should attempt to informally meet and confer with the nonparty (or counsel, if represented). During this meeting, counsel should discuss the same issues with regard to requests for ESI that they would with opposing counsel as set forth above. If an agreement cannot be reached with the nonparty, the standards outlined above will apply generally to the discovery of ESI sought pursuant to Rule 45.

ENTER:

Dated: _____          _____
                             [Name]
                             United States [District/Bankruptcy/Magistrate Judge]

---

[1] www.thesedonaconference.org/
[2] E.g., www.ilnd.uscourts.gov/home/
[3] E.g., www.discoverypilot.com, www.fjc.gov (Under Educational Programs and Materials)
[4] E.g., www.du.edu/legainstitute

**6. Claims of Privilege**:

The parties agree to a protective order that sets forth the confidentiality of documents exchanged in discovery which creates a procedure for challenging claims of privilege or protection that might block production of certain documents or data, subject to review of the proposed order.

**7. Limitations on Discovery**:

None of the parties currently anticipates any limitations on discovery.

**8. Additional Orders**:

None of the parties currently anticipates the need for any additional orders.

/s/  Harvey R. Weingarden
LIPPITT O'KEEFE GORNBEIN, PLLC
By: Harvey R. Weingarden (P31534)
Attorney for Plaintiffs
370 E. Maple Road, Third Floor
Birmingham MI 48009
248-646-8292
hweingarden@lippittokeefe.com

/s/ Jennifer L. Newby
JENNIFER L. NEWBY (P68891)
ASST UNITED STATES ATTORNEY
Attorney for United States Defendants
211 W. Fort Street Ste 2001
Detroit MI 48226
313-226-9100
Jennifer.newby@usdoj.gov

/s/  Patrick Lannen
PLUNKETT COONEY
By: Robert G. Kamenec (P35283)
    Patrick Lannen (P73031)
Attorney for Talmer Bank
38505 Woodward Ave Ste 2000
Bloomfield Hills MI 48304
248-901-4068
rkamenec@plunkettcooney.com
plannen@plunkettcooney.com